1

2

3

4

5

ANNETTE MORASCH (SBN 263797)
**LAW OFFICE OF ANNETTE MORASCH**
5301 Raintree Cir.
Culver City, CA 90230
Tel : (323) 791-6276
Fax : (323) 617-5523
annette@amoraschlaw.com

6

7

Attorneys for Plaintiffs,
GENTILLE BARKHORDAR and
DANNY FARSHADFAR

8

9

10

11

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GENTILLE BARKHORDAR,
an individual;
DANNY FARSHADFAR,
an individual;

     Plaintiffs,

vs.

CENTURY PARK PLACE
CONDOMINIUM ASSOCIATION,
a California Corporation;
MANAGEMENT
PROFESSIONALS, INC., a
California Corporation;
and DOES 1 though 10, Inclusive;

     Defendants.

_____

) **Case No.: 2:16-cv-03071**
)
)
) **COMPLAINT FOR DECLARATORY**
) **AND INJUNCTIVE RELIEF AND**
) **DAMAGES FOR**:
)
)
)  1. HOUSING DISCRIMINATION IN
)    VIOLATION OF THE FAIR
)    HOUSING ACT (42 U.S.C. §3601 *et*
)    *seq.*)
)  2. CAL. FAIR HOUSING AND
)    EMPLOYMENT ACT (CAL. GOV'T
)    CODE §12955 *et seq.*)
)  3. THE UNRUH CIVIL RIGHTS ACT
)    (CAL. CIV. CODE §51 *et seq.*)
)  4. NEGLIGENCE
)
) **JURY TRIAL DEMANDED**

Plaintiffs GENTILLE BARKHORDAR and DANNY FARSHADFAR ("Plaintiffs") complains against Defendant CENTURY PARK PLACE CONDOMINIUM ASSOCIATION, a California corporation, and MANAGEMENT PROFESSIONALS, INC., a California corporation (collectively referred to as "Defendants"), and DOES 1 through 10, Inclusive, as follows:

## **INTRODUCTION**

1.     Century Park Place ("CPP") is a sprawling residential condominium development in Los Angeles, California, directly adjacent to downtown Century City. CPP's over four-hundred condominium units are spread over many acres. CPP provides well-maintained lawns and stately trees.  In this gated and secure community, some of CPP residents are afforded access to the development's many amenities, including a recreation room, three pools with barbeques, five spas, four tennis courts, and in each building, a fitness center. There is also a lounge area in each building. Residents are within walking distance of the Century City mall.

2.     On information and belief, all condominium owners at CPP are automatically part of the Century Park Place Condominium Homeowners' Association (the "HOA"), a Defendant in this action.  CPP condominium owners pay hundreds of dollars each month to the HOA, and these funds are used to provide services to the owners, including maintenance and operation of the condominium's amenities.  The HOA is directed and operated by a Board of Directors.  On information and belief, the CPP HOA's Board of Directors is comprised of

1
2
3

condominium owners who volunteer their time to manage, oversee, and direct the activities of the HOA.

4

     3.     On information and belief, the HOA uses the services of a private third

5

party company, Defendant Management Professionals, Inc., to provide general

6
7

property management services, and to provide security employees to secure the

8

community, investigate resident issues, and enforce the HOA's rules and regulations.

9

     4.     Many families with minor children reside at CPP, seeking to enjoy the

10
11

development's grounds and amenities.  Unfortunately, families with minor children

12

are not able to fully and equally enjoy CPP's amenities in a manner equal to other

13

residents.  Through its actions and inactions, the Defendants have targeted, and

14
15

continue to target, families with minor children, harassing them in their own homes

16

or when they use the amenities, and have created a culture of fear and intimidation at

17

the complex. Defendants hold families with children to a different, and less favorable,

18
19

standard when it comes to enforcing the HOA rules and regulations.

20

     5.     As a result of Defendants' discriminatory acts and omissions, Plaintiffs

21
22

have suffered, and will continue to suffer, damages, and have been, and will continue

23

to be, denied full and equal housing. Through this lawsuit, Plaintiffs seek declaratory

24

relief, injunctive relief, damages, reasonable attorneys' fees, litigation costs and

25
26

punitive damages.

27

28

1

2

3

**PARTIES**

6.      Plaintiff GENTILLE BARKHORDAR is, and at all times relevant

herein was, the owner of a condominium unit at CPP.  For approximately twelve

years, Mrs. Barkhordar has resided and continues to reside in her condominium unit

at CPP. Her minor-aged twins, "M." and "K." were born in March 2014. Thus M. and

K. are approximately two years old as of the filing of this complaint. As a person with

a minor child living in the home, Mrs. Barkhordar is a person whose "familial status"

is protected from unlawful housing discrimination as set forth in the Fair Housing

Act, 42 U.S.C. §3602(k) and the Cal. Fair Employment and Housing Act, Cal. Gov't

Code §12955 et seq.

7.      Plaintiff DANNY FARSHADFAR is, and at all times relevant herein

was, the owner of a condominium unit at CPP. Mr. Farshadfar and Mrs. Barkhordar

are married and live in the same unit at CPP. As a person with a minor child living in

the home, Mr. Farshadfar is a person whose "familial status" is protected from

unlawful housing discrimination as set forth in the Fair Housing Act, 42 U.S.C.

§3602(k) and the Cal. Fair Employment and Housing Act, Cal. Gov't Code §12955 et

seq.

8.      Plaintiffs pay approximately $960.00 in monthly homeowners'

association dues to Defendant HOA and are in good standing with the HOA.

9.      On information and belief, Defendant CENTURY PARK PLACE

CONDOMINIUM ASSOCIATION is a California corporation which operates and/or

manages the Century Park Place Condominiums development, located at 2106 Century Park Lane, Los Angeles, California.  On information and belief, decisions for and on behalf of CPP are made by the CPP Condominiums Homeowners Association Board of Directors ("Board of Directors" or "Board").  Century Park Place Condominium Association is an "owner" within the definition of Cal. Gov't Code §12927(e) and a "business establishment" as defined under Cal. Civ. Code §51 et seq. (the Unruh Civil Rights Act).

10.     On information and belief, Defendant MANAGEMENT PROFESSIONALS, INC. is a private third party property management company hired and used by Defendant HOA to maintain the common areas, secure the complex, investigate complaints, and enforce the HOA's rules and regulations. MANAGEMENT PROFESSIONALS, INC. is an "owner" within the definition of Cal. Gov't Code §12927(e) and a "business establishment" as defined under Cal. Civ. Code §51 et seq. (the Unruh Civil Rights Act).

11.     Plaintiff is informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venture, parent, subsidiary, affiliate, related entity, partner, and/or associate, or such similar capacity, of each of the other Defendants, and was at all times acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission, or ratification of each of

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the other Defendants, and is personally responsible in some manner for the acts and

omissions of the other Defendants in proximately causing the violations and damages

complained of herein, and have participated, directed, and have ostensibly and/or

directly approved or ratified each of the acts or omissions of each of the other

Defendants, as herein described.   Plaintiffs are ignorant of the true names and

capacities of defendants used herein as DOES 1 through 10, inclusive, and therefore

sues these defendants by such fictitious names. Plaintiffs will amend this complaint to

allege their true names and capacities when ascertained.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this Court because Plaintiffs' claims

arise under the federal Fair Housing Act, 42 U.S.C. §3601 *et seq.*  This Court has

supplemental jurisdiction over Plaintiff's California claims.

13.     Venue is proper in this court pursuant to 28 U.S.C. §1391(b) and is

founded on the fact that the real property which is the subject of this action is located

in the Central District and Plaintiffs' causes of action arose in the Central District.

## FACTS UPON WHICH ALL CLAIMS ARE BASED

14.     Plaintiffs are persons with minor-aged twins, "M." and "K."  Plaintiffs

have lived at the CPP Condominiums for approximately 12 years, and since their

birth in March 2014, M. and K. have resided at the CPP Condominiums. At the time

of the filing of this complaint, M. and K. are a little over two years old.

15.     At all times relevant herein, Defendant HOA has used a third party

company, Defendant MANAGEMENT PROFESSIONALS, INC., to provide property management services and security services for the CPP Condominiums development.  On information and belief, MANAGEMENT PROFESSIONALS, INC. employs a General Manager named Dan Nakari. On information and belief, MANAGEMENT PROFESSIONALS also employs security personnel who are responsible for ensuring the security of the gated community, investigating resident complaints, and enforcing the HOA's rules and regulations.

16.     Upon information and belief, since at least early 2015, both Defendants have been represented by an attorney named David Swedelson, SBN 84490. Mr. Swedelson's website advertises as being "a full service community association law firm that provides the highest quality legal counsel to condominium…homeowner associations (HOAs) throughout California." Mr. Swedelson's biography found on his website bills him as "one of California's leading community association attorneys" and that he has litigated "discrimination and fair housing complaints…"

**A.     *Discriminatory Signage Throughout CPP***

17.     Defendants have the following signage around CPP's property which restricts or prohibits activities and behaviors of "children" and/or have a differential and negative impact on families with children.   For example, posted at the pool/spa are signs indicating the following:

- "Children under 14 years of age using the Pool or Spa must be accompanied by an adult over 18 years of age."

- "Children in diapers are allowed to be in the Pool only if they are wearing rubber pants and a bathing suit. An adult at all times must attend them."
- "Beach balls, rafts, toys are not permitted in the Pool or Spa areas."
- "Pool parties in excess of 6 people are prohibited."

18.  Defendant have the following signage in CPP's fitness centers:

- "Children under 14 are not permitted in the gym without the supervision of an adult."

**B.     CPP's Discriminatory Rules, Regulations and Restrictions**

19.     CPP's Rules and Regulations, which were amended, promulgated and approved by the HOA on April 14, 2015, also specifically target families with minor children and limit or prohibit their full and equal use of the development. For example, these Rules and Regulations provide:

- "Children under 14 years of age using the pool or spa must be accompanied by an adult over 18 years of age." (Rule 3.2c.)
- "Children in diapers are allowed to be in the pool only if they are wearing rubber pants and a bathing suit. An adult at all times must attend them." (Rule 3.2d.)
- "Beach balls, rafts, toys …are not permitted in the pool or spa areas." (Rule 3.2g.)
- In connection with the use of the pool and spa area: "No…boisterous

conduct, (screaming and yelling)…" (Rule 3.2m.)

- "Pool parties are prohibited." (Rule 3.2s.)

- "For safety reasons children under the age of 7 are not permitted in a gym unless required to do so for medical reasons and then must be accompanied and supervised by a parent only." (Rule 3.3c.)

- "Children between the ages of 7 and 14 are not permitted to use the gym without being accompanied by an adult." (Rule 3.3d.)

- "**Play Areas**…No one is permitted to play in any part of the Common Area, such as…" then lists the following areas where "play" is prohibited: halls, landings, storage areas, corridors, driveways, roofs, lobbies, ramps, streets, elevators, parking areas, stairways, garage gates, planted areas, trees and the lounges. (Rule 7.2.)

- "**Nuisance and Noise:** Residents shall not do anything that is noxious, offensive or illegal in your unit or in the common areas. Nor can you do anything that will cause unreasonable…disturbance, or annoyance to other residents. The creation of noise in upper units from running, jumping etc.…is of special concern." (Rule 7.5.)

- "**Bicycle Riding, Roller Skating, Roller Blading, Skateboarding and Scooters**: It is prohibited to ride these vehicles anywhere in or on the property." (Rule 7.15.)

20.     Upon information and belief, Defendants' Rules and Regulations in effect *prior* to April 14, 2015 contained similar, or additional, rules targeting families with children.

### C.     Defendants' Enforcement of Discriminatory Rules and Regulations

21.     In addition to signage and rules specifically targeting and limiting the activities of minor children, Plaintiffs found they are, and continue to be, repeatedly harassed by the employees, agents and staff of Defendants, due to M. and K.'s activities.  Defendants do not treat adults engaging in similar activities the way Defendants treat Plaintiffs.

22.     Plaintiffs' downstairs neighbor, attorney Neva Neuman, SBN 86532, has repeatedly threatened to sue Plaintiffs for the actions of M. and K. Neuman has incessantly called and written to Defendants' security personnel and management employees to complain about the "noise" caused by M. and K. Defendants then investigate M. and K.'s behavior and actions, and Defendants issue verbal warnings, threaten to sue Plaintiffs, and issuance of "write ups" to Plaintiffs for purported Rule and Regulation violations.

23.     Upon information and belief, Defendants *have never* issued Ms. Neuman similar write ups when Plaintiffs call and write to Defendants about Ms. Neuman banging on her ceiling when the children are playing—even though Ms. Neuman has admitted to banging on the ceiling by throwing a hard plastic ball at the ceiling, and Defendants' security personnel have witnessed the banging.

24.     On January 15, 2015, CPP's General Manager Dan Narkari emailed both Mrs. Barkhordar and Ms. Neuman. At this time, M. and K. were less than a year old. Ms. Neuman had complained of the children's "noise." Mr. Nakari acknowledged that he inspected Plaintiffs' unit and that Ms. Barkhordar "told me that her baby was crawling and playing one day recently and someone downstairs start[ed] pounding on the ceiling…she went on to say, she knows you hear them [the kids] but what can she do, she has the right to have kids and live there. The kids are crawling and starting to walk and you know that they will start dragging toys and throwing them…I'm not sure what more I can do at this point, other than to say the carpets are there in the bedrooms and living room and have good padding underneath them. There is no illegal padding."

25.     On January 15, 2015, Ms. Neuman responded in an email to Mr. Nakari stating in part she has thrown a rubber ball at her ceiling "when it gets impossible." Ms. Newman continued, "I have also called security several times and they have heard it as well. She is just full of shit re her assertions. Tell her to hire a lawyer as it is she that is making our living situation intolerable and if the future holds a pride of her children interrupting our peace and enjoyment of our habitant (sic) then it is we that will seek an injunction…Please forward this to her and don't edit anything."

26.     Ms. Neuman sent another email to Mr. Nakari on January 15, 2015 stating in part, "How dare she if that is what I wanted I would pound late at night to wake her kids…Please send this to her as this is my response."

27.     On January 16, 2015, Mr. Nakari did indeed forward Ms. Neuman's two emails to Mrs. Barkhordar.

28.     On January 22, 2015, Mrs. Barkhordar reported to Defendants via an email that Ms. Neuman "was banging again violently on her ceiling under our bedroom this evening [as] I was putting my kids to sleep at 9pm. Can the board impose a fine on her for doing this?"

29.     The next day, Mr. Narkari responded stating in part, "Security would need to hear the pounding in order to take action against your downstairs neighbor…As management, I'm not going to keep responding to each other's complaints only to keep getting denials from the other...nor being able to verify the complaints. As I look at it, the magic hour for noise complaints is at 10 pm or later…It is not [the Board's] role to broker or force a resolution."

30.     On February 26, 2015, Defendants' attorney, Mr. Swedelson sent a letter to both Mrs. Barkhordar and Ms. Neuman stating in part "I see that Ms. Neuman is complaining about what she believes is excessive noise coming from [the Plaintiffs'] unit…The Association's management has been unable to verify any of the allegations that either of you have made about the other."

31.     On March 1, 2015, Mrs. Barkhordar e-mailed Defendants and Mr. Swedelson stating in part, "There have been several instances where [Ms. Neuman] was banging violently on our ceiling when the kids were merely crawling in their bedroom and we called Park Place security. In one instance, the guard came over and

actually heard her banging on the ceiling and reported it to the office…I've explained to Dan that I am open to sitting and talking with [Ms. Neuman] but I cannot stop my kids from crawling or playing at home."

32.    The same day, Mr. Swedelson emailed Mrs. Barkhordar asking what type of floor covering is within Plaintiffs' unit. Mrs. Barkhordar responded in part "We have carpet with very thick padding per the association guidelines, so I am not worried about that…"

33.    On March 7, 2015, Ms. Neuman yelled obscenities out of her window at M. and K. On March 9, 2015, Ms. Neuman yelled out her window words to the effect of "shut that kid up" because K. was crying. Mrs. Barkhordar reported Ms. Neuman's behavior to Mr. Nakari both verbally and in writing. Mrs. Barkhordar wrote in part "As I explained to you, there were 2 other instances where the guard actually heard and created a report stating that he heard [Ms. Neuman] banging on [her] ceiling and then on 3/7 again she shouted obscenities outside her window because she heard my kids. You said you would look at the reports and get back to me on whether you can put her on notice for this behavior." Upon information and belief, Defendants did nothing to Ms. Neuman.

34.    On April 14, 2015, Defendant HOA passed amended Rules and Regulations which included the language found in paragraph 19 above.

35.    Around April or May 2015, Mrs. Barkhordar requested from Mr. Nakari that she be allowed to organize a small "Mommy and Me" gathering in the recreation

room. "Mommy and Me" gatherings are for parents and babies, to sing and play with colorful scarfs and small musical instruments.

36.     On May 20, 2015, when Mrs. Barkhordar requested the security footage of an incident between Ms. Neuman and Mrs. Barkhordar's mother, Mr. Nakari wrote a response email to Mrs. Barkhordar stating in part, "we have mentioned it to your mother before on more than one occasion that the, building lobby area, the lounge and the lounge/office lobby are not meant for children to play in. I have had neighbors complain of the toys, and noise from the children. The other day, your son was dragging the yellow wet floor signs around the lobby floor…I do not believe that you mother looks at this from the same perspective as I'm presenting. Please do not think that it is Neva Neuman who is instigating my comments, as that would be untrue." (All sic.)

37.     In this same email, Mr. Nakari responded to Mrs. Barkhordar's request to have a "Mommy and Me" gathering in the recreation room. Mr. Nakari stated "**if the Board approves your request, it would be open to only residents who live at Century Park Place and they all sign a form that they will hold the Association Harmless for any accidents or injuries. This would not be an Association class, it would be organized by you.**" (All sic. Emphasis in original.) Upon information and belief, gatherings that do *not* include children are not required to comply with the same stringent directions stated by Mr. Nakari. Plaintiffs did not hear back from Defendant HOA about the "Mommy and Me" gathering.

38.     In response to Mr. Nakari's email, Mrs. Barkhordar wrote back in part "I feel that [Ms. Neuman] is harassing us by constantly coming over and displaying aggression (verbally and with her gestures) whenever she sees me, my children or my family. As for my kids playing in the lobby, I will ask my mother and housekeeper to keep it down and leave the common areas as they find them before they walk away. I cannot however put handcuffs on my children to make sure they don't touch anything as they walk through the lobby or the common areas or the rec room for that matter. Often children will run and grab onto colorful or interesting looking items and all parents can do is take those items away and put them back. Given that they're twins, it does take a parent more time to get everything under control. And as much as I understand the neighbors' wishes to live in a quiet building and to have dogs that take dumps all over our yards several times a day, we have the right to have kids at Park Place and our kids have the right to enjoy the common areas too. Again, I don't complain to you about the elderly playing cards in the rec room, or their dogs poopooing where we walk, so I don't want them to discriminate against my children. Finally, if there is a 'No children' policy in the Park Place CC&Rs, please send it to me and I will read it. If you don't respond with the latter, I will assume that there is no such clause against children playing in the common areas at Park Place."

39.     The next day, May 21, 2015, Mr. Nakari emailed Mrs. Barkhordar and Defendants' security officer cutting and pasting HOA Rules and Regulations, 7.2 (regarding no play allowed in common areas); two pool rules directed at children; and

the rule concerning children under the age of 7 prohibited from the fitness centers. Around this time, M., K. and two adults were in the common area recreation room. Mr. Nakari informed the adults that children were not allowed in the room.

40.    The same day, Mrs. Barkhordar responded to Mr. Nakari, the security employee and copied in the CPP HOA stating in part: "Thank you Dan, I don't mean to cause anyone any grief, but if this is the case then how is it that adult card games are taking place in the lounge every week? And that dogs play in planted areas and our lawns all the time? Does this mean that the elderly and people with dogs (and their dogs for that matter) have more rights at Park Place than children?"

41.    The same day, Mr. Nakari replied stating in part: "I'm surprised that you do not recognize the difference. Playing cards in a lounge by the elderly is a completely different situation than small children playing in an area with glass tops on tables with hard angles that they can hit their heads against. Plus there are hard edges on the coffee tables that they can get injured. They can grab objects off of the table and get hurt or damage the item they grabbed. The lounge and the lobbies, etc. are not play areas for children. You make your condo safe for your children. Actually I'm amazed that you do not see the difference. Elderly residents playing cards and small children playing in areas that they can hurt are so opposite of each other, I'm surprised. In any event, those are our rules and Security can issue fines for continued use that are in violations of the Rules." (All sic.) Mr. Nakari then cut-and-pasted the 16 common areas where no "play" is allowed.

42.     The same day, Mrs. Barkhordar responded again in writing, stating in part "Dan, you can explain it away but rules are rules and if you keep adding pressure onto the already difficult job of being a mother of twins living above a psychotic neighbor who won't let me have full use of my own unit and balcony, I will have to conclude that your implementation of the rules at Park Place is discriminatory against young children and their parents. Again, you declined to take sides and to impose fines on [Ms. Neuman] when we've had evidence of her banging on my ceiling whenever my children walk around our unit and of her yelling at me over the balcony whenever my children walk on our balcony to get some fresh air, but you're threatening to fine me if my children use the common areas?"

43.     On May 22, 2015, Mr. Nakari responded again, "I find it interesting that other parents respect the Rules and understand why they were written and you fail to do so. In your effort to sidestep Rules and be an exception to the Rules, you yell foul and yell 'discrimination'."

44.     On July 7, 2015, Ms. Neuman threw a manila envelope full of legal papers into M.'s stroller, striking the boy's face with the envelope. The Plaintiffs made a police report, and the next day emailed Mr. Nakari stating in part, "Please notify Chairman of the Board" that Ms. Neuman "is continuing with her threats, bullying and verbal abuse every time she hears my children on our balcony or sees them in the common areas. Yesterday she displayed outright physical abuse as she threw a stack of legal papers at my one-year old son as he was riding happily along in

his pushbuggy at 10:30 AM with my mother. Our neighbors need to know that my children and I have the right to enjoy our balcony and to walk around Park Place without the constant threat of verbal or physical abuse. Please forward my email to the Chairman and ask him to call me…" Defendants did not contact Plaintiffs.

45.    On July 9, 2015, Ms. Neuman mailed a letter to Mr. Nakari and various other individuals, stating in part, "As usual [Mrs. Barkhordar's] two children were left on the terrace screaming for hours…However, a neighbor/owner went outside and yelled and screamed at [Mrs. Barkhordar] to bring the kids inside while hysterical and causing havoc, additionally this owner threatened to call child services, something quite novel I thought…if I have to canvass every unit to find this individual who will support the events of yesterday and corroborate not just the Nuisance value of the children and family I will do so. The Barkhordars have just chosen the wrong party to batter and disparage and make miserable forcing me to place my condo for sale. What is it they do? Make up their own laws to suite them? I truly encourage Security to take a more vigilant role in this matter…I am requesting that Park Place e mail this letter to [Plaintiffs]." (All sic.)

46.    At the beginning of August 2015, the Defendants distributed a letter prepared by Ms. Neuman, and passed out the letter to all of CPP's 432 units. In Ms. Neuman's letter she stated in part that the noise in her unit is "unbearable. Now that there are children involved we can hear every night the children running all over the unit above us to the point that we had to put our unit up for sale. If the Civil Courts

could take nuisance complaints I would have done so years ago, but the courts are congested, so we must rely on the Association to protect us."

47.    Ms. Neuman also wrote, and upon information the Defendants distributed, a four-page rambling diatribe about voting "no" on a proposed amendment allowing hardwood flooring in upper units. This diatribe included the following: "The step of a foot will sound like a truck…the running of children, like a squadron of marines, the throwing of a ball whether to your child or dog, an earthquake. These comparisons are not made for humor, rather for an intelligent and well informed decision as to your vote…[Another resident] addresses his elderly neighbors above his Unit as being quiet, he is the lucky one!! How about those of us who live underneath those…who have children throwing toys and running around all night? That is not his experience!" (All sic.)

48.    On February 1, 2016, Ms. Neuman wrote a letter to Mrs. Barkhordar, and copied in Mr. Nakari. In this letter Ms. Neuman wrote "You and your children have virtually ruined our lives our peace and enjoyment, a fact which you relish in. Every night from 5 p.m. till midnight you encourage your children and family to cause such sever noise emanating from the floor on your condo which is our ceiling. Your children throw Tonka balls and trucks and run till all wee hours of the night, we have been, for the last 2 years sleep deprived. It is to the point that Security has a file on you that is copious and redundant. You just don't care. And let's be clear about this, I am never in any proximity of you and what you refer to kindly to as children. I

walk the other way, IT IS YOU that maintains a residence in the lobby of the condo, outside the condo and your patio, where you and your husband have instigated us by playing a child's piano on Saturdays and Sunday mornings. Your patio is not a backyard. It is a common area. Every one that this is the building has offered complaints about you and your children. I have given up the use of my patio for 2 years to accommodate your lack of child rearing skills and where your children have screamed so that a neighbor threatened to call children's services…It is you that is a nuisance and has not one iota of an idea what living in a condo community consists of…I would hope that you would learn to behave and teach your children to do so, I also encourage you to read to your children if that's possible, it would probably curtail the havoc they cause every day and every night…Speech that is likely to incite a riot is not protected, but this is well above your head."

49.     On March 13, 2016, at exactly 10:00 p.m., Defendants posted a "NOTICE OF VIOLATION" on Plaintiffs' front door for "ACTIVITY VIOLATING POSTED RULES" and "UNNECESSARY NOISE." The following day, Mrs. Barkhordar emailed Defendants and explained, "We were sitting on our couch at 10 pm reading books to my kids this Sunday night, 3/13, and your guard came and put a ticket on my door for excessive noise at 10 pm. Earlier [Ms. Neuman] was banging on her ceiling like a wild dog and I called security about it, but you guys didn't bother to give her a ticket, as usual. I asked you so many times in the past to give her a notice of violation for her aggressive, harassing behavior towards me and my

1
2
3      children, and you declined to do it. Why are you taking sides?"

4          50.    Century Park Place has a wide, one-way roundabout. There is a gate and

5      security guard that stops all incoming traffic. The speed limit for this one-way

6      roundabout is 15 MPH. On March 26, 2016, at approximately 1:30 p.m., Mrs.

7      Barkhordar and her housekeeper were walking on the sidewalk abutting the

8      roundabout with twins M. and K. M. was on a tricycle. M. rolled his trike down the

9      sidewalk and into the roundabout. M. was at no time in any danger, however, just as

10     M. rolled onto the side of the roundabout, Ms. Neuman drove by with Mr. Nakari in

11     the passenger seat. Ms. Neuman unrolled the window and yelled "Nice mothering

12     skills!" Mr. Nakari pointed his finger at Mrs. Barkhordar.

13         51.    When Mrs. Barkhordar, her housekeeper and the twins got back to their

14     building, Mr. Nakari was waiting for them. Mr. Nakari lectured Mrs. Barkhordar

15     about how she would be "very sorry" if "something were to happen" to M. while

16     riding his tricycle. Mr. Nakari informed Mrs. Barkhordar that her children were not

17     allowed to use tricycles, and children were not allowed to be in the street.

18         52.    To follow up on this verbal warning, on April 1, 2016, Mr. Nakari sent

19     Mrs. Barkhordar a communication on "Park Place Century City" letterhead with the

20     subject line "Century Park Place's Rules and Regulations." In this letter, Mr. Nakari

21     once again cut and paste various rules from the HOA Rules and Regulations,

22     including the prohibition on bicycle riding, roller skating, roller blading,

23     skateboarding and scooters; the prohibition of playing in the 16 common areas; and

the rule on nuisance and noise.

53.     On April 5, 2016 Mr. Farshadfar spoke to Mr. Nakari in person concerning the Defendants (and Ms. Neuman's) treatment of M., K. and the Plaintiffs on the basis of their familial status. Mr. Nakari admitted that Defendants had never issued Ms. Neuman a written warning for nuisance. During this conversation, Mr. Farshadfar told Mr. Nakari that the Defendants were violating the law, and discriminating on the basis of familial status. Mr. Nakari told Mr. Farshardfar to "get a lawyer" or words to that effect.

54.     On April 7, 2016, Mr. Farshadfar wrote a five page letter to Mr. Nakari. In sum, Mr. Farshadfar pointed out the Rules and Regulations were discriminatory against families with children and that before enforcing the Rules the Defendants "have to ensure that these rules are legal and not discriminatory, and that they are enforced uniformly and do not target any specific types of individuals or groups." Mr. Farshadfar also requested information about where exactly his children were supposed to play in light of the all of the places his children were *not* permitted to play. Mr. Farshadfar also requested that Defendants "enforce the complaints and rules equally, revise any portion of the CC&R that would be in violation of Federal and/or State laws, and stop threatening us with warnings or citations that could be discriminatory…I am also requesting that within 30 days you consult with the board members and/or the association's legal counsel, and give us in writing whether the rules you stated in your letter, which are obviously intended towards limiting

children's legal right to enjoy their Park Place dwelling and surrounding grounds and community areas, and limitations that you are imposing on them remain as they are, or whether any of them will be modified or eliminated…"

55.    The following day, April 8, 2016, the Defendants' attorney Mr. Swedelson, emailed Mrs. Barkhordar and Ms. Neuman, stating in part, "Ms. Neuman is still complaining about what she believes is excessive noise coming from the Barkhordar unit. The Association's management has been able to verify some of the allegations by Ms. Neuman that Ms. Barkhordar is allowing her children to run, jump and bounce a ball in her unit…Ms. Barkhordar has apparently acknowledged the issue, but says that the kids are playing, as if that is a good excuse for creating a nuisance for the downstairs neighbor. It isn't…The Association does not want to have to deal with your neighbor-to-neighbor dispute. To expect that the Association should step in and do something to deal with your problem is just not reasonable nor is it appropriate."

56.    On Saturday April 9, 2016 at 4:11 p.m., Defendants issued Plaintiffs a second written NOTICE OF VIOLATION for "ACTIVITY VIOLATING POSTED RULES" and "UNNECESSARY NOISE."

57.    On April 11, 2016, Mrs. Barkhordar emailed both Mr. Swedelson and Mr. Nakari stating in part that other neighbors are also disturbed by Ms. Neuman's "loud and obnoxious yelling at me and my children, and although I've reported it to security multiple times in the past several years, the office has failed to give Neuman

a notice of violation for banging violently on her ceiling at all hours of the day and night, which is causing my children and I anxiety and great emotional distress. The banging was once heard by one of the Park Place security guards, who reported it to the office…"

58.  From April 19 to April 22, 2016, Mrs. Barkhordar engaged in a back-and-forth communication with Mr. Swedelson and Mr. Swedelson's office. Mr. Swedelson wrote in part, "I have to tell you that Association management has shared with me the security reports where Association security officers have reported hearing a lot of noise coming from your unit. They heard this noise when they responded to complaints from Neuman. I am not saying that Neva Neuman is an angel and that the problems are all your fault. I am saying that there would likely be no problems if there was not so much noise coming from your unit into Neva Neuman's unit. In the past you have said that the noise Neuman is complaining about is your kids playing and that kids will be kids and there is nothing you can do about the noise. That is not an appropriate response. You cannot allow your children to run and jump and bounce balls if the resulting noise is causing a nuisance to the unit owners below. You either need to add padding or take other steps to minimize the level of the noise or get your kids to stop their running, jumping and ball bouncing when they are in the unit…If the disputes between you and Neuman are not soon resolved, the Association may be compelled to take legal action and that action may likely be taken against you and your husband for violating the CC&Rs by causing a

nuisance. That lawsuit will be time consuming and expensive for you…"

59.    On April 27, 2016, Mrs. Barkhordar sent Mr. Swedelson and Defendants an email asking if the HOA is going to sue her "for complaining of familial status discrimination? For complaining that my downstairs neighbor and security is harassing us because our children make normal children noises? For asking the HOA to do something about the discrimination here at Century Park Place? For my repeated complaints that my children are being held to a different standard than other tenants? Your client wants my children to be silent inside our home. But your client also does not allow my children in common areas."

60.    On April 28, 2016 Mr. Swedelson responded to the email stating in part "this is really a dispute between you and your neighbor, and can only be resolved by a resolution between you and your neighbor. There is nothing that the Association can really do to help you resolve your neighbor-to-neighbor issues…" Mr. Swedelson continued, "I am not saying that the Association is going to sue you, but that is a distinct possibility. Neva Neuman has raised a number of claims that you are causing a nuisance, and it has been verified by the Association's security when they have been called to her unit that there is noise coming from your unit…You can claim that your children are being held to a different standard than other residents, or that the Association does not allow your children to create a nuisance while they are in the common area, but your allegations are just not appropriate and they are not true. I think the problem here is that what you call normal children noises is not normal.

People do not allow their children to run and jump and bounce balls when that noise could bother their downstairs neighbor…You cannot expect others to have to tolerate noise from your children."

61.    The same day, Mrs. Barkhordar emailed Mr. Swedelson and Defendants stating in part that Defendants are "creating a hostile living environment for me and my children and my husband. You have yet to even address my complaints of housing discrimination. You just focus on your client giving us silly warnings. You should ask your client how many times we have complained about your association's refusal to issue warnings to Neuman even though she assaulted my child and bangs on my floor all the time. Kids will be kids. You are personally aiding Dan in discriminating against children."

62.    That was the last Plaintiffs heard from Defendants or Defendants' attorney, Mr. Swedelson.

63.    However, the next day on April 30, 2016, Ms. Neuman told Mr. Farshadfar that his children are making her life miserable, and advised Mr. Farshadfar to get a lawyer.

64.    Upon information and belief, the Defendants harass, warn, write up and fine families with children in a negatively differential fashion. Upon information and belief, residents who harass or interfere with the quiet enjoyment of families with children are not written up or fined by the Defendants.

65.    The Defendants, by their actions and failure to act and through their

agents, have not only discriminated against Plaintiffs due to their familial status, but have created and permeated an atmosphere of hostility for families with minor children.  Unless and until Defendants are enjoined to comply with federal and California fair housing laws, Plaintiffs and other residents with minor children will be denied full and equal opportunity to use and enjoy their residences, and will be subjected to harassment, intimidation, and injury.

66.    Plaintiffs have suffered difficulty and discomfort attempting to use and enjoy their condominium unit.  Plaintiffs have suffered embarrassment, emotional distress, anxiety, stress and frustration due to Defendants' discrimination.  The ongoing nature of Defendants' discrimination constitutes an ongoing violation, and unless enjoined by this Court, will result in ongoing and irreparable injury.

## FIRST CAUSE OF ACTION
### FAIR HOUSING ACT  (42 U.S.C. § 3601 *et seq*).
### (Plaintiff against All Defendants)

67.    Plaintiffs re-allege and incorporate by reference the allegations contained in all above paragraphs of this Complaint as if fully set forth herein.

68.    Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, by discriminating against Plaintiffs on the basis of their familial status. 42 U.S.C. §§3602(k); 3604(a).

69.    Specifically, Plaintiffs allege that, through a pattern and practice of discrimination, Defendants have violated the Act by discriminating in the terms, conditions, and privileges of ownership of the CPP condominiums.  42 U.S.C.

§3604(b).

70.     Plaintiffs further allege that Defendants violated the Act by making, printing, and/or publishing statements indicating a preference based on a person's familial status, in violation of 42 U.S.C. §3604(c).

71.     In so doing, Plaintiffs allege that Defendants have made unavailable or denied their dwelling to Plaintiffs, M. and K., in violation of 42 U.S.C. §3604(a).

Wherefore, Plaintiffs pray for relief as requested below.

**II. CALIFORNIA FAIR EMPLOYMENT & HOUSING ACT**
**(Cal. Gov't Code § 12955 *et seq.*)**
**(Plaintiff against All Defendants)**

72.     Plaintiffs re-allege and incorporate by reference the allegations contained in all above paragraphs of this Complaint as if fully set forth herein.

73.     Plaintiffs allege Defendants have violated Cal. Gov't Code §12955(a), which prohibits discrimination against any person on the basis of familial status.

74.     Plaintiffs allege Defendants have violated Cal. Gov't Code §12955(c), which prohibits Defendants from making, printing or publishing, or causing to be made, printed or published, any notice or statement that indicates any preference, limitation or discrimination based on familial status.

75.     Plaintiffs allege Defendants have violated Cal. Gov't Code §12955(d), which prohibits any person subject to Section 51 of the Civil Code from discriminating against any person on the basis of familial status.

76.     Plaintiffs allege Defendants have violated Cal. Gov't Code §12955(f)

which prohibits Defendants from harassing or otherwise discriminating against any person when the Defendants' dominant purpose is retaliating against a person who has opposed practices unlawful under FEHA.

77.     Plaintiffs allege Defendants have violated Cal. Gov't Code §12955(g) which prohibits Defendants from aiding or abetting discrimination on the basis of familial status. Specifically, Plaintiffs allege Defendants have aided and abetted Neva Neuman's (and other residents') discrimination against children, and Defendants have created a hostile living environment for families with children by selectively enforcing the HOA Rules and Regulations.

Wherefore, Plaintiff prays for relief as requested below.

### III. UNRUH CIVIL RIGHTS ACT
### (Cal. Civ. Code § 51 *et seq*).
### (Plaintiff against All Defendants)

78.     Plaintiffs re-allege and incorporate by reference the allegations contained in all above paragraphs of this Complaint as if fully set forth herein.

79.     In committing the acts and omissions herein described, Defendants have unlawfully discriminated against Plaintiffs on the basis of their familial status, in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*

Wherefore, Plaintiff prays for relief as requested below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IV. NEGLIGENCE

## (Plaintiff Against All Defendants)

81.     Plaintiffs re-allege and incorporate by reference the allegations contained in all above paragraphs of this Complaint as if fully set forth herein.

82.     Defendants owed, and continue to owe, Plaintiffs a duty to operate the CPP Condominiums in a manner that is free from unlawful discrimination and to employ, train, and supervise their directors, employees, agents, and themselves to fulfill that duty.  Defendants breached that duty by drafting, adopting, and enforcing discriminatory rules and regulations that discriminate against families with children.

83.     Plaintiffs further allege that Defendants have not taken any steps, let alone all reasonable steps, to prevent discrimination and retaliation in housing on the basis of familial status. Upon information and belief, Defendants have done nothing to investigate Plaintiffs' repeated complaints of familial status discrimination.

84.     Defendants' negligence has harmed and continues to harm Plaintiffs because they have been denied the full use and enjoyment of their dwelling and common areas.  Defendants' negligence includes but is not limited to, their negligent failure to train its Board of Directors, their employees and agents regarding the requirements of federal and state fair housing laws; their negligent failure to hire persons who were familiar with the requirements of federal and state fair housing laws; their negligent failure to supervise themselves and their employees regarding compliance with the requirements of federal and state fair housing laws; their

negligent failure to discipline or terminate employees, who failed to comply with the requirements of federal and state fair housing laws; and their negligent failure to operate the development in conformity with accepted industry custom and standards.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

1.     That this Court declare that the discriminatory practices of the Defendants as set forth above violate the aforementioned statutes;

2.     That this Court enjoin Defendants to eliminate all discriminatory posted signage throughout the development; to revise any and all discriminatory rules and regulations; to notify all of their residents the revised rules and regulations were unlawful, and that the rules and regulations will no longer be enforced; and to educate Defendants and their agents, members, and/or employees in the requirements of federal and state fair housing laws;

3.     That this Court award general, compensatory, statutory and punitive damages to Plaintiffs in an amount within the jurisdiction of this Court;

4.     That this Court award special and consequential damages to Plaintiffs according to proof;

5.     That this Court award attorneys' fees, litigation expenses and costs of suit, pursuant to 42 U.S.C. §3613(c), Cal. Gov't Code § 12989.2, and Cal. Civil Code §55; and

6.     Such other and further relief as the Court may deem just and proper.

Dated: 5/4/16                              **LAW OFFICE OF ANNETTE MORASCH**

                              By:    /s/ Annette Morasch
                                     ANNETTE MORASCH
                                     Attorneys for Plaintiffs,
                                     GENTILLE BARKHORDAR
                                     DANNY FARSHADFAR

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury for all claims for which a jury is permitted.

Dated:  5/6/2016                          **LAW OFFICE OF ANNETTE MORASCH**

                              By:    /s/ Annette Morasch
                                     ANNETTE MORASCH
                                     Attorneys for Plaintiffs,
                                     GENTILLE BARKHORDAR
                                     DANNY FARSHADFAR